IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DION MATHEWS,

                Plaintiff,                OPINION AND ORDER

v.                                            20-cv-645-wmc

JOLINDA WATERMAN, PETER JAEGER,
MARK KARTMAN, SONYA ANDERSON, BRIAN KOOL,
JERRY SWEENY, SHIRLEY GATES, CARRIE SUTTER,
TAMMY DICKMAN, SARA MASON
and GARY BOUGHTON,

                Defendants.

---

      Plaintiff Dion Mathews, who is representing himself, contends that the Special Needs Committee at Wisconsin Secure Program Facility ("WSPF") denied him an adequate mattress for his degenerative hip condition and associated pain despite recommendations from his doctors. He is proceeding on claims under the Eighth Amendment, Fourteenth Amendment and state negligence law against several DOC employees who served on the Committee at various times.

      Now before the court are the parties' cross-motions for summary judgment. (Dkt. #25 and Dkt. #43.) Although the evidence shows that plaintiff reported pain for years, which he attributed to the mattresses he used in the Restricted Housing Unit ("RHU"), plaintiff has failed to show that any defendant violated his constitutional rights. An inmate is not entitled to the medical treatment of his choice, and the evidence shows that plaintiff received treatment for his hip condition and pain. Moreover, plaintiff has not offered evidence that a better mattress was the only reasonable treatment. Finally, defendants are entitled to qualified immunity. Accordingly, the court will deny plaintiff's motion for summary judgment, grant

defendants' motion as to the federal claims, and decline to exercise supplemental jurisdiction over plaintiff's state law claims.[1]

## UNDISPUTED FACTS[2]

**A. Background**

Plaintiff Dion Mathews was housed at WSPF from March 14, 2006, to September 16, 2020. During the relevant time period, defendants worked in the following positions at WSPF: Carrie Sutter and Tammy Dickman were financial program supervisors in the business office; Shirley Gates was the human resources director; Jerome Sweeney and Mark Kartman were security directors; Jolinda Waterman was nurse and manager of the Health Services Unit ("HSU"); Sonya Anderson was a nurse; Brian Kool was a unit manager; Sara Mason was a corrections officer and unit manager; Peter Jaeger was the deputy warden; and Gary Boughton was the warden.

Before 2015, there were two types of "regular" mattresses used at WSPF. The mattresses for inmates in the general population ("GP") were blue, and the mattresses for inmates in RHU were black. The blue and black mattresses varied in color, length, stitching

---

[1] Plaintiff also filed a motion for recruitment of counsel to assist him (dkt. #71), but as an experienced litigator in this court, and as reflected in his submission at summary judgment in this case, he is fully capable of presenting understandable and reasoned submissions regarding relevant facts and legal arguments. Ultimately, the problem for plaintiff in this case is not its complexity, but that the undisputed facts fail to show defendants acted with deliberate indifference to his medical needs or treated him differently that other similarly situated prisoners. Therefore, this motion will also be denied. Finally, plaintiff filed a motion for leave to file a surreply (dkt. #79), which has been granted and considered by the court.

[2] Unless otherwise indicated, the following facts are material and undisputed for purposes of summary judgment. The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying evidentiary record where appropriate.

and cost per unit.  When new, the GP mattress dimensions were 30 x 78 x 3 inches, and the RHU mattress dimensions were 29 x 77 x 3 inches, although the thickness of the mattresses could deteriorate over time due to normal wear and tear regardless whether the mattress was in RHU or GP.  Also, the black mattresses were more expensive and stitched differently to prevent inmates in RHU from tearing into them to hide weapons or contraband.

By January 2015, WSPF stopped purchasing the blue and black mattresses and started purchasing only one type of clear mattress that was to be used by all the inmates.  WSPF aims to purchase about 100 of the clear mattresses per year and distributes them to the units as requested by the corrections programs supervisors or other unit staff.  The corrections supervisor for each unit typically determines whether a mattress replacement is needed.

The only time an inmate does not receive a "regular" mattress is if the Bureau of Health Services ("BHS") has authorized the use of a "specialized mattress" or "medical mattress" for the inmate.  Under BHS Policy and Procedure No. 300:07, inmates at WSPF must follow a specific process to request "special needs" items or restrictions, such as an extra pillow, a low bunk, medical shoes, or a specialized mattress.  In particular, inmates must first submit a request for a medical mattress to the Special Needs Committee at the prison, which is comprised of staff representatives from various departments and is responsible for reviewing the financial, security, and medical aspects of the inmate's request for an accommodation and recommending an appropriate disposition.  The Special Needs Committee meets every six to eight weeks and may approve a "specialized" mattress only if the requesting inmate has a severe disabling degenerative joint disease, is pregnant, or is recovering from joint replacement.  The Committee may approve a "medical" mattress (described as "Air, Gel, Clinitron, or similar") if the inmate has bedsores, severe burns, or paraplegia or quadriplegia with skin issues.  If the

Committee approves a special needs request for a specialized or medical mattress, it forwards the request to the BHS medical director for what is referred to as a "Class III" authorization.

### B. Mathews' Requests for a Better Mattress

Starting as early as 2011, Mathews began complaining about the quality of the mattresses in RHU. Mathews had suffered from hip pain for years, and he had been diagnosed with trochanteric bursitis, degenerative changes, and arthritis in his hips. Mathews believed that a higher quality mattress would help him, but his requests for one were denied. For example, in March 2011, he complained to his treating provider, Dr. Cox, about his mattress. Cox responded that he knew "the mattress on Alpha [an RHU unit] are old and worn, but approval for two mattresses has to come through the Special Needs Committee and criteria have to be met." (Dkt. #1-2.) Even so, Cox stated that he would forward Mathew's request.[3] In April 2011, the Special Needs Committee denied Mathews' request on the ground that he had not shown a medical need for a specialized mattress.

Mathews continued to complain to HSU staff about his hip pain, and repeatedly attributed his hip pain to his mattress, at least in part.[4] (*E.g.*, Health Service Request ("HSR") Aug. 4, 2014, dkt. #29-7 (blaming hip pain on very thin mattress); HSR Nov. 1, 2014, dkt.

---

[3] Mathews argues that Dr. Cox recommended or "prescribed" a thicker mattress to him in March 2011, but the evidence does not support his characterization of Cox's response. Rather, the evidence shows that Cox merely forwarded Mathews' request to the Special Needs Committee, expressing skepticism that the request would be approved. Accordingly, the Committee that met in April 2011 did not countermand a medical directive order, nor even a recommendation from Dr. Cox.

[4] Defendants submitted a record of Mathew's bed assignments between August 2017 and April 2022, which show that Mathews slept on several, different mattresses during this time period. (Dkt. #50-1.) Mathews does not provide detail about the state of each of the mattresses he used, nor whether every mattress he used during the relevant time frame was deficient.

4

#29-5 (stating that his "hip pain problem comes solely from the very thin mattress provided"); HSR Feb. 2, 2015, dkt. #29-20 (complaining that his hips were "being injured by the thin mattress").) His medical providers prescribed a variety of different treatments for his reported hip pain, including ibuprofen, Tylenol, aspirin, celecoxib, diclofenac gel, lidocaine cream, injections and physical therapy. Despite these various treatments, however, Mathews hips continued to hurt.

On November 28, 2015, Mathews wrote a letter to Warden Boughton complaining about the conditions at WSPF, including the quality of his mattress. (Dkt. #49-1.) On December 9, 2015, Boughton responded to Mathews that mattresses are replaced as needed, and that inmates with medical issues are given priority. Boughton also explained that WSPF replaces mattresses on a regular basis subject to available institution funds. (Dkt. #49-2.)

In 2018, Mathews was housed in WSPF's Alpha Unit of RHU, where Corrections Programs Supervisor Sara Mason was responsible for addressing inmate requests for a new or different mattress. If an inmate complained about his mattress, Mason or another staff member would inspect the mattress to determine whether a replacement was needed and would order a mattress replacement, if necessary. Alpha Unit staff also inspected mattresses each time an inmate left the unit to look for hidden contraband and determine whether the mattress needed to be replaced. If an inmate requested a thicker or specialized mattress for medical reasons, however, Mason would instruct the inmate to submit a request to the Special Needs Committee.

In October 2017, Mathews was seen by an offsite orthopedist who recommended physical therapy, as well as a thicker mattress if Mathews' hip had not improved in two months. (Dkt. #1-21.) On May 7, 2018, Mathews submitted an HSR complaining about hip pain and

5

requesting a specialized mattress, pointing to the October 2017 recommendation. A nurse responded to Mathews, explaining that his request had been forwarded to the Special Needs Committee for review. On July 19, 2018, the Committee met and considered Mathews' request. At that time, the following staff were serving on the Committee: HSU Manager Waterman; Deputy Warden Jaeger; Security Director Kartman; Nurse Anderson; and Corrections Unit Supervisor Kool. Nurse Anderson reviewed Mathews' medical records for the Committee and opined that he did not meet the criteria for a specialized or medical mattress under BHS policy. More specifically, Anderson noted that he had no decubitus ulcer, third-degree burns, paraplegia/quadriplegia with skin issues, severe disabling degenerative joint disease, pregnancy, or a new post-op, joint replacement. The Committee denied Mathews' request and notified him that he had no qualifying diagnosis that would support approval of a different mattress.

Mathews continued to complain of hip pain, however, and on September 10, 2018, he received an x-ray of his hip and sacroiliac joints. The x-ray showed modest degenerative changes/osteoarthritis, although no pelvic or hip fracture. In response, Mathews' primary care provider gave him the following plan of care: Voltaren gel for arthritis pain; physical therapy; exercises to strengthen the muscles around the hips; an offsite orthopedic evaluation; and another referral to the Special Needs Committee for a medical mattress. On November 9, 2018, the Committee again considered and denied Mathews' request for a different mattress because his diagnosis did not meet the requirements for receiving a specialized or medical mattress under the applicable BHS policies. Defendants Waterman, Anderson, Dickman and Kool participated in the Committee's denial. Instead, Mathews received an extra pillow and blanket to help support his hip while he slept.

On December 26, 2018, Mathews was seen by Gundersen Orthopedics for his ongoing hip pain. The orthopedics provider again recommended that Mathews receive a thicker mattress and a second pillow. (Dkt. #1-24.) Neither Mathews nor his provider submitted another special needs request after that visit. Mathews saw an outside orthopedist again in July 2020, who diagnosed bilateral chronic trochanteric bursitis, but noted that he had minimal degenerative changes. (Dkt. #29-12.) The orthopedist also noted that she discussed a variety of treatment options, including pain medication, physical therapy, ultrasound, assistive device and injection therapy, but that Mathews "declined" all those options because "his main goal today is to get a mattress that is softer so he is able to sleep on his sides" without pain and "[h]e believes that the mattress will really be the key for him." (Dkt. #29-12.) The provider "strongly recommend[ed] a softer mattress" for him. (*Id.*)

In approximately December 2020, plaintiff was moved to GP to a cell with a thicker mattress than he had in RHU. The mattress provided relief for his hip pain.

OPINION

Summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When, as here, the parties have filed cross-motions for summary judgment, the court must consider the burden of proof each party would bear on an issue at trial, then require the party with the burden to produce evidence on that issue sufficient for a reasonable trier of fact to rule in their favor. If a party fails to meet this burden, the court may enter summary judgment on the issue against that party. *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997); *Mid Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995).

7

Here, plaintiff was granted leave to proceed on claims that: (1) defendants Boughton and Mason violated his rights under the Fourteenth Amendment's Equal Protection Clause by providing inmates in RHU with significantly worse mattresses than inmates in GP; and (2) defendants Waterman, Jaeger, Kartman, Anderson, Kool, Sweeny, Gates, Sutter, and Dickman, as part of the Special Needs Committee, violated his Eighth Amendment and state law rights by refusing to approve a specialized mattress for him despite the recommendations of his treating doctor and orthopedic specialists.

As explained in the court's screening order (dkt. #15), plaintiff's Eighth Amendment claim is limited to the Special Needs Committee decisions occurring *after* a doctor or specialist recommended that he receive a better mattress. The evidence establishes that there were two such recommendations from an outside orthopedist in October 2017 and December 2018, and the only relevant Special Needs Committee decisions post-dating those recommendations were in July and November 2018. So it is those decisions that this opinion will address. Finally, because the evidence establishes that defendants Gates, Sutter and Sweeney did not participate in either of the July or November 2018 Committee decisions, they are entitled to summary judgment on plaintiff's claims against them without further discussion. *See Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) ("Individual liability under § 1983 requires personal involvement in the alleged constitutional deprivation.")

I.   **Fourteenth Amendment**

The Equal Protection Clause prohibits state action that discriminates on the basis of membership in a protected class or irrationally treats similarly situated persons differently. *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010). Where (as here) no fundamental

8

right or suspect classification is at issue, equal protection claims are evaluated under the rational-basis standard of review. *Discovery House, Inc. v. Consol. City of Indianapolis*, 319 F.3d 277, 282 (7th Cir. 2003). To prevail on his equal protection claim, plaintiff must prove that: (1) defendants treated him differently from others similarly situated; (2) the difference in treatment was caused by plaintiff's membership in a class to which he belonged; and (3) the difference in treatment was not rationally related to a legitimate state interest. *Smith v. City of Chicago*, 457 F.3d 643, 650 (7th Cir. 2006).

Plaintiff's equal protection claim fails on the first element. Specifically, plaintiff has produced insufficient evidence to show that Warden Boughton or Captain Mason treated him differently while he was in RHU from other similarly situated inmates in GP. First, he has no evidence to show that the mattress in RHU were significantly worse than those in GP. Even the declarations of two inmates stating that the mattress in RHU were in poor condition, say nothing about the mattresses in GP. (Dkts. ##30, 31.) So their statements are insufficient to provide a comparison between the mattresses in the units. Mathews also points to Dr. Cox's response to an HSR in March 2011, stating that the RHU mattresses were old and worn, but Cox's statement was made before the time period relevant to this case, and before 2014, when WSPF began purchasing the same mattress for the entire prison. Finally, Mathews points to his own declaration in which he states that in his experience, the mattresses in GP are better than those in RHU. Again, however, Mathews' limited experience in GP is not sufficient to show that WSPF intentionally and systematically provided worse mattresses to inmates in RHU because of their status as segregated inmates.

Moreover, even if plaintiff's own experience was sufficient to create a genuine factual dispute about the condition of the mattresses in RHU versus GP, he has failed to present

9

evidence that either Warden Boughton or Captain Mason were responsible for the difference in mattresses. Instead, the evidence shows that Boughton was not responsible for purchasing or replacing mattresses in either unit: that decision was up to the corrections program supervisor or unit staff. And, although Mason was a corrections program supervisor in RHU, she had no involvement in assessing or replacing mattresses in GP. Thus, no reasonable jury could conclude that either Boughton or Mason treated inmates in RHU differently than inmates in GP based on the inmates' assigned housing unit.

Finally, and arguably most importantly, the ultimate decision maker as to plaintiff's receiving a special or medical mattress fell to members of the Special Needs Committee, and there is zero evidence that decision was made because of plaintiff's placement in the RHU. Rather, the evidence is that denial was made on a fairly rigid set of severe medical conditions that his diagnosis did not yet meet. Accordingly, defendants are entitled to summary judgment on this claim.

## II. Eighth Amendment

The Eighth Amendment's prohibition on cruel and unusual punishment prohibits prison officials from acting with "deliberate indifference" to "substantial risk of serious harm" to a prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). As applied here, the Eighth Amendment prohibits prison officials from acting with deliberate indifference to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976). To prevail on medical deliberate indifference claim, a prisoner must demonstrate objective and subjective elements: (1) an objectively serious medical condition; and (2) a state official who was deliberately (that is, subjectively) indifferent to that need. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019);

*Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). For purposes of summary judgment, defendants do not dispute that plaintiff's hip problems and associated pain were a serious medical condition. They do, however, dispute whether they were aware he had a serious medical need and whether they were deliberately indifferent to it. They also argue that they are entitled to qualified immunity.

When the defendant is raising a qualified immunity defense, as defendants in this case are, the plaintiff must show that the defendants violated clearly established law, which means that the law was sufficiently clear at the time of the alleged violation that every reasonable official would understand what he or she was doing is unconstitutional. *Tousis v. Billiot*, 84 F.4th 692, 698 (7th Cir. 2023). The plaintiff can prove this in one of three ways: (1) point to a closely analogous, binding case that established a right to be free from the type of action the defendants performed; (2) identify a clear trend in the case law showing that the recognition of the right by controlling precedent is merely a question of time; or (3) show that the defendant's conduct was "so egregious and unreasonable that no reasonable official could have thought he was acting lawfully." *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 620–21 (7th Cir. 2022) (citations omitted).

The court will first consider plaintiff's claims against defendants Waterman and Anderson, the medical professionals who were involved in the Special Needs Committee's decisions to deny plaintiff a specialized or medical mattress, and potentially the most culpable. Plaintiff argues that it was clearly established law that nurses (as well as other, non-medical professionals) cannot disregard the recommendations of a medical specialist. In addition, he argues that it is clearly established that medical providers may not persist with treatment that they know to be ineffective. *See Gonzalez v. Feinerman*, 663 F.3d 311, 314–15 (7th Cir. 2011).

Specifically, in this case, plaintiff argues that because two orthopedists recommended plaintiff be given a thicker mattress for his hip pain, which had not been relieved by any other treatment, Nurses Waterman and Anderson violated clearly established law by failing to approve his request for a specialized or medical mattress.

Plaintiff is correct that, under some circumstances, a defendant's decision to ignore instructions from a medical specialist may well constitute deliberate indifference. *See Wilson v. Adams*, 901 F.3d 816, 822 (7th Cir. 2018) ("A jury can infer conscious disregard of a risk from a defendant's decision to ignore instructions from a specialist[,] [b]ut that does not mean that a doctor must always follow the recommendation of a specialist.") (internal citations omitted); *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) ("Failing to provide care for a non-medical reason, when that care was recommended by a medical specialist, can constitute deliberate indifference.") However, this does not mean binding case law clearly established that prison officials must *always* follow a recommendation from a medical specialist. *See Wilson*, 901 F.3d at 822 (medical provider's disagreement with specialist's treatment decision not deliberate indifference). Rather, disregarding such a recommendation amounts to deliberate indifference only if plaintiff can show that failing to follow the recommendation was such a significant departure from accepted medical practices that the defendant failed to exercise any medical judgment. *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016); *Estate of Cole v. Fromm*, 94 F.3d 254, 262 (7th Cir. 1996). Thus, where declining to follow a recommendation is simply a "disagreement between a prisoner and his doctor, or even between two medical professionals, [it] does not establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

12

Here, plaintiff offers no evidence that the Committee's failure to follow the orthopedists' recommendations amounted to a significant departure from accepted medical practices, nor that Waterman and Anderson in particular failed to exercise medical judgment. Indeed, although the thick mattress recommended by the two orthopedists suggests that they viewed a new mattress as necessary, the record does not reflect details about the basis for their judgment. *See Hoskins v. Hiland*, No. 23-CV-346, 2024 WL 4103922, at *4 (E.D. Wis. Sept. 9, 2024) (dismissing Eighth Amendment claim against Special Needs Committee for denying low bunk restriction recommended by inmate's neurologist because the Committee's denial "was based on professional medical judgment" and there was no evidence decision fell outside professional medical standards.) Thus, plaintiff has not met his burden of proof given the lack of evidence in the record suggesting that: the orthopedists believed plaintiff's mattress caused his hip problems, as plaintiff now suggests; a thicker mattress was the only reasonable treatment, as opposed to additional pillows and blankets; the orthopedists were even familiar with the particular mattress on which plaintiff slept or the types of mattresses available to RHU and GP inmates at WSPF in general, aside from plaintiff's own representations to them.[5]  *See Arce v. Barnes*, 662 F. App'x 455, 458 (7th Cir. 2016) (affirming summary judgment for doctor on denial of thicker mattress that had been recommended by another doctor where record contained "no details about the basis" for mattress recommendation).

---

[5] Although outside the relevant timeframe for this case, plaintiff's medical record from a July 2020 orthopedist appointment suggests that plaintiff's primary, if not sole, focus at that appointment was to obtain a recommendation for a thicker or softer mattress, to the exclusion of other treatment options discussed by the orthopedist that might alleviate his pain. (Dkt. #29-12.)  Whether plaintiff had a similar focus at his October 2017 and December 2018 orthopedist appointments is unclear, but plaintiff's refusal to consider other treatment options offered by the orthopedist at least undermines his argument that a different mattress was the only reasonable treatment option.

Moreover, plaintiff points to no clearly established law stating that the recommendations of an outside medical specialist necessarily trump a prison staff's consideration of DOC and BHS policy to the contrary, especially if the policy was developed with input from medical professionals. Here, the evidence shows defendants Waterman and Anderson considered plaintiff's request by reviewing his medical records, as contemplated by Special Needs Committee policies. After reviewing plaintiff's records, they exercised their own medical judgment in concluding that plaintiff lacked any of the qualifying medical conditions that would permit approval of a specialized or medical mattress. Specifically, he did not have a severe disabling degenerative joint disease, pregnancy, a new post-op joint replacement, Debubitus ulcer, third-degree burns or paraplegia/quadriplegia with skin issues. According to their training, those were the only medical conditions that necessitated approval of a different mattress. Particularly given the penological consideration that might justify not giving an inmate special treatment except in extreme cases where the level of pain is severe and no other medical option to relieve the pain exists, plaintiff has not provided evidence that conflicts with defendants Waterman's and Anderson's conclusions; nor has he identified any clearly established law stating that medical providers must disregard such policies in favor of a specialist's recommendation or risk liability for a constitutional violation.[6]

---

[6] As this court has recognized before, the DOC's reliance on the Special Needs Committee to determine the medical necessity of certain accommodations can be problematic, as it gives non-medical staff influence in the decision-making process, divests primary medical providers the final call in determining medically necessary accommodations, and lessens the individualized considerations in providing medical care. *E.g.*, *Fields v. DeYoung*, No. 16-CV-405-JDP, 2018 WL 5995487, at *8 (W.D. Wis. Nov. 15, 2018). However, plaintiff was not granted leave to proceed on any claim challenging the policy itself; nor has he presented any evidence that any of the defendants in this case were responsible for creating the Special Needs Committee policies, much less the policies concerning granting specialized or medical mattresses specifically.

As for the non-medical members of the Special Needs Committee, defendants Kool, Dickman, Kartman and Jaeger did not violate the Eighth Amendment by deferring to the medical staff's opinions about whether plaintiff's condition was severe enough to meet the special-needs policy standards. *See Fields v. DeYoung*, No. 16-CV-405-JDP, 2018 WL 5995487, at *6–7 (W.D. Wis. Nov. 15, 2018) (non-medical members of Special Needs Committee "entitled to rely on [nurse member's] medical determination") (citing *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012)); *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008) ("The policy supporting the presumption that non-medical officials are entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care is a sound one."). Therefore, all defendants are entitled to summary judgment on plaintiff's Eighth Amendment claims as well.

**III.    Negligence**

Finally, plaintiff asserts negligence claims under Wisconsin law against defendants. If related to a federal claim in the same action, this court would have supplemental jurisdiction over those claims under 28 U.S.C. § 1367(a). Plaintiff does not allege any other basis for federal jurisdiction over the state-law claims than the constitutional claims now rejected and absent unusual circumstances, district courts are to relinquish supplemental jurisdiction over state-law claims if all federal claims have been resolved before trial. *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 352 (7th Cir. 2019). Here, neither party identifies any unusual circumstances that would justify retaining jurisdiction over plaintiff's state-law claims, so the court will decline to exercise subject matter jurisdiction over those claims.

Plaintiff may refile those claims in state court, subject to the applicable Wisconsin statute of limitations. While those limitations periods may be tolled during the pendency of

this case, plaintiff should be aware that any limitations period will begin to run again 30 days from now. *See* 28 U.S.C. § 1367(d) ("The period of limitations for any claim asserted under [the court's supplemental jurisdiction] . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."). Thus, should plaintiff wish to pursue his negligence claims further, he will need to file suit in state court as soon as possible.

ORDER

IT IS ORDERED that:

1) Plaintiff Dion Mathews' motion for recruitment of counsel (dkt. #71) is DENIED.

2) Plaintiff's motion for summary judgment (dkt. #25) is DENIED.

3) Plaintiff's motion for leave to file a surreply (dkt. #79) is GRANTED.

4) Defendants' motion for summary judgment (dkt. #43) is GRANTED with respect to plaintiff's Eighth and Fourteenth Amendment claims.

5) Plaintiff's state law claims are DISMISSED without prejudice under 28 U.S.C. § 1367(c)(3).

6) The clerk of court is directed to enter judgment and close this case.

Entered this 4th day of November, 2024.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge